## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| ARIGNA TECHNOLOGY LIMITED, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 2:21-cv-00054-JRG-RSP |
| | § | |
| VOLKSWAGEN AG, ET AL. | § | |
| | § | |
| *Defendants.* | § | |

## REPORT AND RECOMMENDATION

Before the Court are three motions: Motion to Dismiss Plaintiff's First Amended Complaint for Improper Venue and Failure to State a Claim filed by Defendant BMW of North America, LLC ("BMW NA"), Dkt. No. 85; Motion to Dismiss Pursuant to Rules 12(b)(5) and 12(b)(6) filed by Bayerische Motoren Werke AG ("BMW AG"), Dkt. No. 88; and Motion to Dismiss Plaintiff's Second Amended Complaint for Improper Venue and Failure to State a Claim filed by BMW NA and BMW AG (together, "BMW"). Dkt. No. 213.

### I.   **Background**

Arigna's initial complaint was filed on February 18, 2021 and set forth the claim that BMW was infringing U.S. Pat. No. 7,397,318. Dkt. No. 1. Later, Arigna filed its First Amended Complaint ("FAC") which added a claim of infringement of U.S. Pat. No. 8,247,867 (the "'867 Patent"). Dkt. No. 28. However, because of a parallel proceeding before the United States International Trade Commission, the Court ordered the case stayed as to the '867 Patent against BMW and others. Dkt. No. 186. Finally, on July 22, 2021, Arigna filed its Second Amended Complaint ("SAC") which added additional defendants. Dkt. No. 182.

For venue as to BMW, Arigna's SAC alleges that six independently-owned-and-operated dealerships located in the District are agents of BMW NA and that BMW NA has ratified these dealerships as places of business of BMW NA. Dkt. No. 213 at 4. These dealerships, or "Centers," are: Classic BMW, BMW of Beaumont, BMW Motorcycles of Denton, BMW Motorcycles of North Dallas, MINI of Plano, and BMW of Tyler. *Id.* BMW argues that these Centers do not render venue proper as to BMW NA and therefore the case should be dismissed. *Id.* at 2-3. BMW does not allege that venue here is inconvenient or seek to transfer this case to another district.

## II.   **Legal Standard**

A party may challenge venue by asserting that venue is improper in a responsive pleading or by filing a motion. Fed. R. Civ. P. 12(b)(3). A court may decide whether venue is proper based upon "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009) (quoting *Ginter ex rel. Ballard v. Belcher, Prendergast & Laport*, 536 F.3d 439, 449 (5th Cir. 2008)). Additionally, when resolving the matter on the pleadings, the Court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:13-CV-459, 2014 WL 978685, at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco*, 570 F.3d at 237–38). Furthermore, "[i]f the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of venue." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2nd Cir. 2005); *accord Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004) ("To survive a motion to dismiss for improper venue when no evidentiary hearing is held, the plaintiff need only make a *prima facie* showing of venue."); *accord Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988).

In matters unique to patent law, Federal Circuit law—rather than the law of the regional circuit—applies. *In re Cray*, 871 F.3d 1355, 1360 (Fed. Cir. 2017) (citing *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999)). "Section 1400(b) is unique to patent law, and 'constitute[s] the exclusive provision controlling venue in patent infringement proceedings' . . . ." *Id.* (quoting *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S.Ct. 1514, 1518 (2017)) (alterations in original). Thus, Federal Circuit law governs the analysis of what § 1400(b) requires. *Id.* Under § 1400(b), venue is proper based on (1) "where the defendant resides" or (2) "where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). For the former, a domestic corporation resides only in its state of incorporation. *TC Heartland*, 137 S.Ct. at 1520.

For the latter, "Where a complaint alleges infringement, the allegations 'satisfy the acts of infringement requirement of § 1400(b)' '[a]lthough the [] allegations may be contested.'" *Seven Networks, LLC v. Google LLC*, 315 F.Supp.3d 933, 942 (E.D. Tex. 2017) (quoting *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F.Supp.3d 916, 928 (E.D. Va. 2017)) (alterations in original). When determining whether a defendant "has a regular and established place of business," there are "three general requirements relevant to the inquiry: (1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *Cray*, 871 F.3d at 1360. Finally, "the Plaintiff bears the burden of establishing proper venue." *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013 (Fed. Cir. 2018).

III.  **Analysis**

As an initial matter, the parties dispute whether Arigna's filing of its SAC rendered moot BMW NA's and BMW AG's pending motions to dismiss the FAC. This Court has consistently held that the filing of an amended complaint moots a motion to dismiss the previous complaint

3

unless the amended complaint expressly incorporates the previous complaint. *Ultravision Techs., LLC v. Eaton Corp. PLC,* Case No. 2:19-cv-00290-JRG, 2019 WL 11250161, at *1 (E.D. Tex. Nov. 7, 2019) (internal citations omitted).

Here, Arigna's SAC did not expressly incorporate the FAC.  Therefore, Arigna's filing of the SAC "moots a motion to dismiss the [FAC]." *Ultravision*, 2019 WL at *1. Thus, both BMW NA's motion to dismiss the FAC (Dkt. No. 85) and BMW AG's motion to dismiss the FAC (Dkt. No. 88) are moot. Because these motions are moot, and because the newest motion does not meaningfully address the 12(b)(6) issue, the only issue before the Court is whether venue is proper as to BMW NA.[1]

Proceeding to venue, the parties do not dispute the "acts of infringement" requirement, nor whether Arigna met *Cray*'s first requirement, a physical place in the District. Dkt. No. 244 at 8. Additionally, both parties agree that BMW NA is a Delaware limited liability company and therefore resides outside the District. Dkt. No. 213 at 3. Thus, the issues between the parties regarding venue are whether: (1) BMW NA is collaterally estopped from arguing venue, (2) the Centers are agents of BMW NA, and (3) BMW NA has "established or ratified" the Centers as places of business of BMW NA.

### A.  Collateral Estoppel

Arigna argues that BMW is collaterally estopped from relitigating whether venue is proper because of this Court's prior decision in *Blitzsafe Texas, LLC v. Bayerische Motoren Werke AG*, 2018 WL 4849345 (E.D. Tex. Sept. 6, 2018) (finding that venue was proper as to BMW in the

---

[1] BMW AG cannot contest venue because a foreign corporation is subject to venue in any judicial district in the United States. *In re HTC Corp.*, 889 F.3d 1349, 1357 (Fed. Cir. 2018). Instead, BMW NA and BMW AG argue that venue must be proper as to all defendants and "[b]ecause Arigna cannot allege facts sufficient to establish proper venue over BMW NA in this District (because no such facts exist), the SAC must be dismissed for all BMW defendants." Dkt. No. 213 at 8-9.  Because the Court finds that venue is proper as to BMW NA and BMW AG, the Court need not address BMW's arguments concerning whether venue must be proper as to all defendants.

District). Dkt. No. 244 at 6-8. In the Fifth Circuit, "preclusion of a previously-litigated issue under the doctrine of offensive collateral estoppel requires" that [1] "the issue be identical to the issue previously litigated"; [2] "the issue was fully and vigorously litigated in the [previous] proceeding"; [3] "the previous determination of the issue was necessary for the judgment in that proceeding"; and [4] "no special circumstances exist that would render preclusion inappropriate or unfair." *Universal American Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1136 (5th Cir. 1991).

Here, collateral estoppel will not be applied. Arigna's collateral estoppel argument is weakest at the first requirement because changes in the controlling legal principles alter the context for the issues addressed in *Blitzsafe. See Petro-Hunt, L.L.C. v. U.S.*, 365 F.3d 385, 397-98 (5th Cir. 2004).[2] *Blitzsafe* was decided in September 2018, and since *Blitzsafe*, the Federal Circuit has issued two opinions that have modified the controlling legal principles for venue under § 1400(b): *In re Google*, 949 F.3d 1338 (Fed. Cir. 2020) (holding in part that venue can be proper if the defendant's agent is regularly transacting the defendant's business at the place of business) and *Andra Grp., LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283 (Fed. Cir. 2021) (holding that a place of business of one corporation cannot simply be imputed to another where corporate formalities have been maintained). Because *Blitzsafe* did not present the opportunity to consider these cases, the Court finds "changes in the controlling legal principles prevent [BMW] from being precluded from litigating the issue in this case." *Petro-Hunt*, 365 F.3d at 399.

---

[2] Although *Petro-Hunt* did not specifically address offensive collateral estoppel, the only difference between collateral estoppel and offensive collateral estoppel under Fifth Circuit law is the fourth requirement. *Id.* at 548 ("As the district court stated, some of our decisions recognize a fourth factor, namely, whether there are any special circumstances that make it unfair to apply the doctrine. These equitable considerations apply only to 'offensive collateral estoppel'.") Therefore, *Petro-Hunt*'s analysis of the first requirement—whether the issues are identical—applies here.

### B. Agency under *Cray*'s second requirement

The next dispute between the parties falls under *Cray*'s second requirement: that the physical place located within the district be a regular and established place of business. *Cray*, 871 F.3d at 1360. For this requirement, "a regular and established place of business requires the regular, physical presence of an employee *or other agent* of the defendant conducting the defendant's business at the alleged place of business." *Google*, 949 F.3d at 1345 (internal quotation omitted) (emphasis added). Here, "agent" is emphasized because that is the primary dispute between the parties: whether the Centers in the District are agents of BMW NA for purposes of § 1400(b).

The concept of agency has been linked to patent venue for more than 100 years. *Id.* at 1344. In 1897, Congress passed a statute that contained a patent venue provision, which is now § 1400(b), and a service provision, which allowed service to be made on an agent of the defendant. *Id.* (quoting 54 Cong. Ch. 395, 29 Stat. 695 (1897)). Because these two provisions were originally contained in the same statute, Congress "expressly linked" patent venue to agency via the service provision. *Id.* Furthermore, the legislative history confirms that "the 'main purpose' of the statute was to 'give original jurisdiction to the court where a permanent agency transacting the business is located.'" *Id.* at 1345 (quoting 29 Cong. Rec. 1900 (1897)) (emphasis in original).

"An agency relationship is a 'fiduciary relationship that arises when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act.'" *Id.* (quoting Restatement (Third) of Agency § 1.01). "The essential elements of agency are (1) the principal's 'right to direct or control' the agent's actions, (2) 'the manifestation of consent by [the principal] to [the agent] that the [agent] shall act on his behalf,' and (3) the 'consent

by the [agent] to act.'" *Id.* (quoting *Meyer v. Holley*, 537 U.S. 280, 286 (2003)) (alterations in original).

In *Google*, the Federal Circuit ultimately concluded that two internet service providers (ISPs) located in this District—Cable One and Suddenlink—were not agents of Google for purposes of patent venue. *Id.* at 1347. This conclusion was based on three determinations: (1) Google did not have "interim control" over the ISPs; (2) the ISPs' installations of the Google Global Cache (GGC) servers were one-time events, thus not "regular"; and (3) the maintenance of the GGC servers, which was regular, was ancillary to Google's business, and thus the ISPs were not thereby conducting the business of Google. *Id.* at 1346.

For the first determination, respondent argued that the ISPs were agents of Google because the ISPs provided the GGC servers with network access. The Federal Circuit held this did not establish an agency relationship because Google had no right of "interim control" over the ISP's provision of network access. *Id.* (citing Restatement Third of Agency § 1.01 *cmt. f.*) ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.").

For the second determination, respondent argued that the ISPs were agents of Google because the contract between the ISPs and Google required the ISPs to "coordinat[e] with logistics and shipping personnel; inventory [] equipment received; unpack[] equipment; assembl[e] equipment based on information and instructions provided by Google; connect[] equipment to power strip(s) and Ethernet cable(s); and power[] up equipment & execut[e] installation scripts configuring IP address information." *Id*. Based on these installation provisions, the Federal Circuit held that "although these provisions may be suggestive of an agency relationship, . . . the

installation activity does not constitute the conduct of a 'regular and established' business, since it is a one-time event for each server." *Id*.

For the third determination, the respondent argued that the ISPs were agents of Google because the ISPs provided on-going "basic maintenance activities" for the GGC servers. *Id.* The Federal Circuit held that these provisions failed to establish agency because "maintenance activities cannot, standing alone, be considered the conduct of Google's business[]" because "maintaining equipment is meaningfully different from—as only ancillary to—the actual producing, storing, and furnishing to customers of what the business offers." *Id.* Thus, a plaintiff must show that the three essential elements of agency are met—most importantly that the principal has "interim control" over the agent's actions— and that the agent's actions are regular, *i.e.* not "a one-time event," and directed toward the "conduct of the [defendant's] business." *Id.*

Here, the Court finds that Arigna has made a *prima facie* showing that the Centers are agents of BMW NA for the purposes of venue. Beginning with the first essential element—interim control—Arigna argues that "BMW[3] has the right to direct and control how each Center carries out promoting, selling, and servicing BMW's products" through BMW's Standard Provisions. Dkt. No. 244 at 17. Arigna argues that these "Standard Provisions dictate what the Centers 'shall and shall not do,' and grant BMW NA 'the right to give interim instructions or directions to the Centers once their relationship is established.'" Dkt. No. 244 at 18 (quoting Restatement (Third) of Agency § 1.01 *cmt. f.*). Arigna cites the following Standard Provisions as examples of BMW NA's interim control over the Centers:

---

[3] In its motion, Arigna refers to both BMW entities as BMW; however, BMW NA, not BMW AG, is the BMW entity that is a party to the Center Agreements. Therefore, the Court notes that it does not alter quotes from Arigna's motions, but when considering the various agreements, the Court specifies the agency relationship at issue is the relationship between BMW NA and the various Centers.

- Dkt. 231-8 at 7 (Centers must comply with Center Operating Requirements Addendum "as issued, amended, canceled, or superseded from time to time by BMW");
- *Id.* at 12 (Centers must "comply with all reasonable standards established by BMW NA from time to time relating to Center's BMW Vehicle Operations");
- *Id.* at 17 ("Center shall require its personnel to meet with BMW . . . for the purposes of training and to use training materials as may be suggested from time to time by BMW");
- *Id.* ("Center agrees to advertise BMW Products and customer service for BMW Products in accordance with the standards set for in Paragraph 3(b) and . . . other reasonable policies, standards, and guidelines as BMW NA may establish from time to time");
- *Id.* at 22 ("Center shall inspect, prepare, and condition each new BMW vehicle in accordance with . . . inspection procedures furnished from time to time by BMW");
- *Id.* at 24 ("Center will furnish to BMW NA, on such forms and at such times as BMW NA reasonably may require, complete and accurate reports of Center's sales and inventories");
- *Id.* at 37 ("Center will supply consumers with a copy of such warranties in such fashion as may from time to time be required by BMW").

Dkt. No. 244 at 18.

In addition to these provisions, Arigna cites other "structural" provisions through which BMW NA asserts its control over the Centers, including: "reserving a right to object to changes in ownership, operators, successors, name, identity, location, or structure; controlling their hours; approving their business plans; inspecting their premises, accounts, and records; and by recruiting, educating, and training the very agents who carry out BMW's business." Dkt. No. 244 at 19 (citing Dkt. Nos. 231-2 and 231-8) (internal citations omitted). Also, Arigna argues that "BMW 'retains the capacity throughout the relationship to assess the agent's performance, provide instruction to the agent, and terminate the agency relationship by revoking the agent's authority.'" Dkt. No. 244 at 18-19 (quoting Restatement (Third) of Agency § 1.01 *cmt. f.*).

Additionally, Arigna points to BMW NA's contractual right to require the Centers to "remedy, to the satisfaction of BMW NA, any practice or method of operation which would have a detrimental effect upon consumer satisfaction or would impair the reputation or image of BMW,"

Dkt. No. 231-2 at 16, and BMW NA's ability to terminate the Center Agreements as further evidence of BMW NA's interim control. Dkt. No. 244 at 18 (citing Dkt. No. 231-8 at 39-41) Finally, although the "Center Operating Requirements Addendum" was not filed with BMW's motion, Arigna argues that this document demonstrates interim control because the Center Agreements require the Centers comply with the Center Operating Requirements, which detail the "BMW Product, Center Facility, Corporate Identity, Personnel, Training, Financial, Equipment, Special Tool, Certified Pre-Owned Vehicle, Parts, and Demonstrator Requirements applicable to Center." Dkt. No. 244 at 12 (quoting Dkt. No. 231-8 at 6-7).

In response, BMW NA argues that the Standard Provisions provide that Centers "are not agents of BMW NA and may not hold themselves out as such." Dkt. No. 213 at 5 (citing Dkt No. 213-8 at 59-60 (¶ 18(f)); Dkt. Nos. 213-6, 213-7 at ¶14.06). Furthermore, BMW argues, citing a declaration from BMW NA's Network Development Manager, that it "does not control or dictate—the hiring, firing, recruiting or compensation of any East Texas Dealership's employees" and that the Centers "control their properties; manage, purchase, and finance their inventory; set their prices; oversee and compensate their employees; and manage their finances." Dkt. No. 213 at 7. As to the ability to terminate, BMW argues that "each Dealership may terminate its relationship with BMW NA at any time, on 60-days' notice, and do whatever it wishes with its own property—because BMW NA does not control the property." Dkt. No. 213 at 5. Finally, BMW argues that other courts have found that car dealerships are not agents of the manufacturer in other contexts. Dkt. No. 252 at 8.

Moving to the other two essential elements of agency, Arigna argues that these elements are met by the signing of the Center Agreements between BMW NA and each Center. Dkt. No. 244 at 19. The Center Agreements provide that the purpose of the agreements "is to authorize

Center to operate an approved BMW Center and to set forth responsibilities of both BMW NA and Center in providing BMW Products and services to the consuming public." *Id.* (quoting Dkt. No. 231-2 at 2). Thus, Argina essentially argues that, by BMW NA signing the Center Agreement, it manifests its consent to the Center acting on its behalf and, by the Center signing the Center Agreement, the Center is consenting to act on BMW's behalf. In response, BMW argues that "BMW NA and the Dealerships expressly disavow any agency or fiduciary relationship and agree that each Dealership will conduct its BMW Vehicle Operations on its own behalf and for its own account . . ." Dkt. No. 213 at 22 (citing 213-8 at 59-60 (¶ 18(f)) (internal quotations omitted).

The Court finds that Arigna has identified enough undisputed facts to make a *prima facie* showing that the Centers are agents of BMW NA for the purposes of venue under § 1400(b). Beginning with interim control, Arigna cited provisions in the various agreements supporting the conclusion that BMW NA has the right "to give interim instructions or directions to the [Centers]." Restatement (Third) of Agency at § 1.01 *cmt. f.* This is shown by BMW NA's ability to control the hours of operation of the various Centers, to dictate the steps the Centers must take to complete tasks, and to require the Centers to implement procedures to maintain customer satisfaction. The Centers' employees are required to attend in-person training by BMW NA employees and to follow detailed instructions on how they perform their work, and even the hours of operation.

Furthermore, BMW NA has failed to argue how the provisions cited by Arigna do not show BMW NA's interim control. Instead, BMW NA responds by simply pointing to the provision that disavows agency and relying on general statements. As to the provision disavowing agency, it is (1) not controlling on the issue of whether there is an agency relationship for the purposes of venue and (2) it does not dispute the provisions Arigna cites to support its *prima facie* case. As to the declaration, it makes general assertions that the Centers control their properties and manage the

dealership employees, but it also fails to specifically address the provisions cited by Arigna. Thus, these facts are undisputed evidence in the record regarding venue. *Ambraco,* 570 F.3d at 238.

Additionally, the Court finds that Center Operating Requirements and the Center Operating Requirements Addendum further support Arigna's *prima facie* case for agency. The Center Operating Requirements Addendum establishes requirements, which are "issued, amended, canceled, or superseded from time to time by BMW NA following review with Center." Id. at 7 (¶ (m). The Center Operating Requirements concern the same requirements, but they can be "amended, cancelled or superseded from time to time by BMW NA . . ." unilaterally. *Id.* at 6 (¶ (l)).

The Standard Provisions require the Centers to review the "[Center Operating Requirements] Addendum with BMW NA representatives at the Retail Business Plan review, satisfy outstanding obligations under its Improvement Addendum, if applicable, and comply with all reasonable standards established by BMW NA from time to time relating to Center's BMW Vehicle Operations." *Id.* at 12. Failure to comply with the Center Operating Requirements, Center Operating Requirements Addendum, or Improvement Addendum may results in a reduction in the allocation of BMW Vehicles to the Center, *id.* at 10, or "will jeopardize the Center's ability to renew the Center Agreement and could subject Center to early termination of [the Center] Agreement." *Id.* at 13. Thus, taking the agreements as a whole, the Court finds that it is a reasonable conclusion that BMW NA retains the right to direct and control the Centers through its ability to establish and amend the Center Operating Requirements and the Center Operating Requirements Addendum at any time and then ensure the Centers comply with those requirements by reducing allocation of vehicles or terminating the agreement.

The Court further finds that the other requirements for agency are met. The Court agrees with Arigna that the Center Agreements demonstrate BMW NA's manifestation of consent to the Centers to act on its behalf and the Centers' consent to act. Furthermore, the Centers are unlike the ISPs in *Google* because the selling of BMW vehicles is both a regular act by the Centers and is central to, rather than "ancillary to," BMW NA's business.

Two final notes, first, given the various legal issues related to agency, the Court emphasizes that it is not finding that the Centers are agents of BMW NA for every legal context, but rather the Court only finds that the Centers are agents of BMW NA for the issue of establishing venue under § 1400(b) as interpreted by *Cray* and *Google*.

Second, the Court's finding that the Centers are agents of BMW NA is in line with the "main purpose" of § 1400(b), which is to allow suit in a district where a "permanent agency transacting the business [of the defendant] is located." *Google*, 949 F.3d at 1345. It is clear from the various agreements that the Centers are transacting the business of BMW NA—*i.e.* selling and servicing BMW vehicles—in the District. Therefore, the Court's finding is not broadening the scope of § 1400(b), but rather the finding shows how the agency relationship between the Centers and BMW NA is the "permanent agency" which § 1400(b) was intended to include. In sum, the Court finds that Arigna has put forth enough undisputed facts to establish its *prima facie* case that the Centers are agents of BMW NA and thus, Arigna has satisfied *Cray*'s second requirement.

## C. Established or Ratified under *Cray*'s third requirement

"Finally, the third requirement when determining venue is that 'the regular and established place of business' must be 'the place of the defendant.'" *Cray*, 871 F.3d at 1363. "Thus, the defendant must establish or ratify the place of business." *Id.* When determining establishment or ratification, the Court considers "whether the defendant owns or leases the place"; "whether the

defendant conditioned employment on an employee's continued residence in the district or the storing of materials at a place in the district so that they can be distributed or sold from that place"; or "exercises other attributes of possession or control over the place." *Id.*

Additionally, "marketing or advertisements also may be relevant, but only to the extent they indicate that the defendant itself holds out a place for its business." *Id.* Furthermore, when considering the defendant's representations that it has a place of business in the district, "potentially relevant inquiries include whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself." *Id.* at 1363-64. But advertising alone is not sufficient. *Id.* at 1364. Furthermore, "a 'place of business' is not restricted to real property that the defendant must 'own or lease,' and that [§ 1400(b)] could be satisfied by any physical place that the defendant could 'possess or control.'" *Google*, 949 F.3d at 1343 (quoting *Cray*, 871 F.3d at 1363).

Here, the Court finds that BMW ratified the Centers as places of business of BMW. Although Arigna argues that BMW both established and ratified the Centers, the evidence shows that BMW did not establish the Centers, but rather the Centers established their locations after receiving permission from BMW. *See Cray*, 871 F.3d at 1365-66. However, Arigna's arguments regarding BMW's establishment of the Centers also support its ratification argument.

Beginning with storing materials, Arigna argues that "BMW also requires each Center to 'store[] inventory," "conduct[] demonstrations," and store 'materials . . . so that they can be distributed or sold from the place.'" Dkt. No. 244 at 10 (quoting *Cray*, 871 F.3d at 1365). Arigna cites the following provisions to supports its argument:

- Dkt. 231-2 at 10 (Centers "shall keep BMW Products exclusively at the Center Facilities");
- Dkt. 231-8 at 19 ("For purposes of demonstration, Center shall have available at all time such number of the most current model BMW Vehicles as required");

14

- id. at 10 (BMW will provide "Sales, service, and parts literature and other printed materials relating to BMW Products"); and
- id. at 23 (Centers shall "deliver to the customer the BMW Service and Warranty Information booklet supplied by BMW" and "shall have copies of applicable warranty information on display and ready for customer use").

Dkt. No. 244 at 11.

Next, Arigna argues that BMW requires the Centers to display BMW logos in a specific manner. "[T]he 'signage on, about, or relating to' each Center 'associates the space as belonging to [BMW].'" Dkt. No. 244 at 13 (quoting *ZTE*, 890 F.3d at 1015; *accord Cray*, 871 F.3d at 1363-64). Specifically, Arigna points to the provisions requiring the Center "to display conspicuously at and around the Center Facility such BMW approved signs and pylons," Dkt. No. 231-8 at 14, and to use BMW trademarks in accordance with BMW's policies. *Id.* at 14-15. BMW also precludes the Centers from using other trademarks. *Id.* In response, BMW argues that it does not force the Centers to display BMW trademarks but that simply "the Dealer Agreements provide for the consistent display of BMW trademarks because both parties have a substantial interest in assuring that the vehicles dealers sell are recognizably associated with the quality and goodwill of the BMW brand." Dkt. No. 213 at 21. This simply further supports the provisions cited by Arigna.

Next, Arigna argues that by listing the Centers on BMW's website, and through its marketing and advertising, BMW holds out the Centers as places of BMW. Dkt No. 244 at 14 (citing *Cray*, 871 F.3d at 1363). This argument is supported by the Standard Provisions which states that "BMW NA will use its Internet web site(s) to provide sales leads to centers, to facilitate sales, and to facilitate the flow of BMW Product and sales information among BMW NA, BMW centers, and consumers." Dkt 213-8 at 16. Additionally, BMW advertising is designed so that "the customer doesn't know, or doesn't understand, the handoffs that have to occur between BMW of North America, their local dealership, financial services, which are all three separate parts of a

buying process, *but to a customer they're all one brand*." Dkt. No. 244 at 15-16 n. 9 (quoting BMW marketing executive, Brian Voynick) (emphasis in original) (internal quotations omitted). BMW NA also requires the Center to list on its website the link to BMW NA's website (www.bmwusa.com), Dkt. No. 213-8 at 16, thus supporting the conclusion that the Centers are places of business of BMW NA.

In response, BMW argues that BMW NA's website "identifies the Dealerships for what they are: authorized retail 'dealerships' or 'centers' where consumers can obtain BMW NA products and services for those products." Dkt. No. 213 at 6. Furthermore, BMW NA's website does not allow consumers to purchase a vehicle from the website but rather it "directs consumers to visit local (independent) dealers to test drive, purchase, and take possession of BMW NA vehicles." Dkt. No. 213 at 6. BMW also argues that another "court rejected allegations nearly identical to those Arigna makes here as insufficient to impute the locations of independent BMW dealerships to BMW NA for venue purposes." Dkt. No. 213 at 17 (citing *Omega Patents, LLC v. Bayerische Motoren Werke AG*, 508 F.Supp.3d 1336, 1342 (N.D. Ga. Dec. 21, 2020)).

Again, BMW's arguments are unpersuasive. Arigna has adduced evidence that clearly shows BMW NA's website lists the Centers and facilitates the flow of potential consumers to the Centers. Furthermore, BMW's arguments do not dispute that BMW NA "lists the alleged place of business on [its] website." *Cray*, 871 F.3d at 1363. This Court must decide based on the facts in this record, which may be far more complete than the record in other cases, such as *Omega*.

Finally, Arigna argues that BMW also exercises "attributes of possession or control" over the Centers' physical locations. First, Arigna argues that BMW NA's controls the location from which Centers may build and conduct their business: "Article D provides that (1) BMW 'approves the location' of all Center Facilities, and (2) the Centers must operate 'exclusively' at the

designated Facilities." Dkt. No. 244 at 9 (citing No. 213-2 at 9-10). Arigna further argues that BMW maintains control over Center's physical location by requiring the Center to seek approval to: "(a) 'change its principal place of business'; (b) 'change any location of the Center Facilities'; (c) 'establish any additional locations'; (d) 'make any major structural or design change in Center Facilities'; or (e) 'change the usage or function of any locations or facility approved herein.'" Dkt. No. 244 at 10 (quoting Dkt. No. 213-2 at 10). Failure to seek prior written approval could result in termination of the Center Agreement. Dkt. No. 244 at 10 (citing Dkt. No. 213-8 at 40). These provisions likely show that the agreement between BMW and each Center is conditioned "on [a Center's] continued residence in the district," *Cray*, 871 F.3d at 1363, but at a minimum, these provisions clearly show that BMW retained "attributes of possession or control" over the Centers' locations. *Id.*

In sum, Arigna argues that making "the Centers the *only places* at which consumers may test drive, lease, purchase, or receive BMW financing, maintenance, warranty services, or recalls for new and certified BMWs, is the *ultimate form* of ratifying and holding out these places as the places of BMW, which has no other consumer-facing places." Dkt. No. 244 at 16 (emphasis in original).

The Court finds Arigna has made a *prima facie* showing that BMW has ratified the Centers as places of business of BMW. The various agreements before the Court show that BMW specified where the Centers could establish a dealership and limited the Centers' sales activity to that location.  The agreements further show that BMW requires the Centers to display BMW logos in certain ways, maintain certain information regarding warranties, and advertise BMW products in an approved manner. Furthermore, although BMW's website and advertising do not specifically state the Centers are owned by BMW, the website and advertising hold the Centers out as places

from which an individual could purchase BMW products—*i.e.* the Centers are places of business of BMW. Thus, the Court finds that Arigna adduced sufficient facts to make a *prima facie* showing that the ratification factors weigh in favor of finding that BMW ratified the Centers as places of BMW for the purposes of venue under § 1400(b).

Beyond BMW's specific arguments addressed above, BMW makes two general arguments as to why the Centers are not places of business of BMW. According to BMW, as long corporate formalities are maintained, (1) the location of one corporate entity cannot be imputed to another corporate entity and (2) one corporation cannot ratify the location of another corporation as its own place of business. Dkt. No. 213 at 11, 15. As to the first argument, the Court agrees with BMW: "where related companies have maintained corporate separateness, the place of business of one corporation is not imputed to the other for venue purposes." *Andra*, 6 F.4th at 1289. The Court finds no evidence that BMW and the Centers have not maintained corporate separateness and does not impute the location of the Centers to BMW. However, imputation is not the issue before the Court; therefore, BMW's arguments concerning imputation miss the mark.

The issue before the Court is whether BMW ratified the Centers as places of business of BMW. In response to this issue, BMW argues that "the Federal Circuit rejected this 'ratification' theory of venue outright because a 'threshold inquiry when determining whether the place of business of one company can be imputed to another, related company is whether they have maintained corporate separateness.'" Dkt. No. 213 at 12 (quoting *Andra*, 6 F.4th at 1289). To further support its argument, BMW proceeds to cite a series of cases that hold a distributor's place of business cannot establish venue for its supplier. *Id.* at 12-13; 13 n.6.

Of these cases, BMW focuses on three to support its ratification argument: *Omega*; *West View Research, LLC v. BMW N. Am., LLC*, Case No. 16-cv-2590, 2018 WL 4367378 (S. D. Cal.

Feb. 5, 2018); and *Board of Regents v. Medtronic PLC*, Case No. A-17-CV-0942-LY, 2018 WL 4179080 (W.D. Tex. July 19, 2018). The Court finds none of these cases change the analysis. As mentioned above, *Omega* did not address a record as detailed as the present one.  Furthermore, *Omega* expressed concern that finding venue proper would conflate §1400(b) with the "doing business" inquiry of the general venue statute.  However, merely targeting local residents would be doing business in the district. §1400(b) requires physical places of business.  Ratification addresses whether a principal has adopted an agent's physical place as its own.  The two concepts are entirely different.

As to *West View,* that court was addressing an *alter ego* theory: "Plaintiff's theory is predicated on the Defendants' operating agreement with the BMW and MINI dealerships exerting such control that the dealerships *are essentially the same entity*." *Id.* at *8 (emphasis added). Finally, *Board of Regents* was also focused on whether corporate formalities were maintained. *Id.* at *2. Again, the issue before the Court is not whether BMW and the Centers are the same entity or whether they maintained corporate formalities, but rather whether BMW ratified the Centers as places of business of BMW.

BMW is also incorrect in arguing that *Andra* rejected ratification. On the very same page BMW cites from *Andra*, the Federal Circuit states, "[petitioner] contends that each of the Non-Store Defendants has *ratified* the retail stores as its own based on the criteria outlined in *In re Cray* . . . ." *Id.* at 1289 (emphasis added). The Federal Circuit then proceeds through the ratification factors outlined in *Cray* to determine whether the Non-Store Defendants—which were separate corporate entities from the Store Defendants—ratified the Store Defendant's physical stores as places of business of the Non-Store Defendants. *Id.* 1289-90. Under BMW's reading of *Andra*, the

Federal Circuit would not have had to go through the ratification factors after finding all of the *Andra* defendants had maintained corporate formalities.

Furthermore, *Andra* is not the only Federal Circuit opinion that applied the ratification factors in the context of two distinct corporate entities. *ZTE* involved whether a call center—which was maintained by one corporation—could be a place of business of the petitioner, which was a separate corporate entity. *Id.* at 1010. After establishing that the burden to show venue is the plaintiff's, the Federal Circuit directed the district court to consider the ratification factors outlined in *Cray* on remand. *See id.* at 1015-16 (directing the district court to consider whether ZTE "possesses, owns, leases, or rents the office space for the call center or owns any of the equipment located there"; "whether any signage on, about, or relating to the call center associates the space as belonging to ZTE"; "whether the location of the call center was specified by ZTE"; and "whether [call center] would need permission from ZTE [] to move its call center outside of the [District]"). Thus, it is clear to the Court that imputation and ratification are distinct legal concepts under Federal Circuit jurisprudence and that the ratification factors outlined in *Cray* apply in the context of whether one corporation ratified another corporation's locations as its place of business.[4]

### D. Texas State Law

BMW's final argument is that Texas state law renders venue improper as to BMW NA: "Texas law *expressly prohibits* BMW NA from directing or controlling the Dealerships, except in very limited (and inapplicable) circumstances." Dkt. No. 213 at 20-21 (citing Tex. Occ. Code § 2301.476(c)(1)-(3)) (emphasis in original). Furthermore, BMW argues that providing a warranty

---

[4] This last line also addresses BMW's indirect statement seeking to restrict *Cray* to "the context of an employee of the defendant, not two separate corporate entities . . . .". Dkt. No. 231 at 10. It is true that *Cray* was decided in the context of an employee, but as shown above, *Andra* and *ZTE* both applied *Cray* and the ratification factors from *Cray* when determining whether the location of one corporation could be ratified as a place of busines of a separate corporation.

does not establish venue because "[m]any companies provide warranties that are serviced through local entities . . . ." Dkt. No. 213 at 23.

These arguments are also unpersuasive. As to the Texas Occupational Code, a defendant does not need to have an ownership interest in a place of business for it to be ratified as the defendant's place of business under § 1400(b). *Google*, 949 F.3d at 1343 (*citing* Cray, 871 F.3d at 1363). Thus, whether Texas law prohibits BMW from owning the Centers does not govern whether venue exists. As to the warranty services, the fact that BMW provides warranty services standing alone would not render the Centers places of business of BMW.  This is only a very small part of the record of comprehensive control of the Centers by BMW.

## IV.   **Conclusion**

The Court finds that Arigna has carried its burden to establish a *prima facie* case that the Centers are agents of BMW NA and that BMW has ratified the Centers as places of business of BMW. Therefore, the Court finds that BMW NA has regular and established places of business in the District and thus venue is proper as to BMW NA and BMW AG in this District under § 1400 (b). Accordingly, it is recommended that the first two motions (Dkt. Nos. 85 and 88) be denied as moot, and that the third motion (Dkt. No. 213) be denied.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*). Any objection to this Report and

Recommendation must be filed in ECF under the event "Objection to Report and Recommendations [cv, respoth]" or it may not be considered by the District Judge.

**SIGNED this 18th day of January, 2022.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE